UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN NICHOLSON,

   Petitioner,       Case No. 4:14-CV-10828

v.

             HON. MARK A. GOLDSMITH

RANDALL HAAS,

   Respondent.
_____/

**OPINION & ORDER
(1) DISMISSING WITH PREJUDICE THE PETITION FOR A WRIT OF HABEAS
CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND
(3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Steven Nicholson, confined at the G. Robert Cotton Correctional Facility in
Jackson, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In
his pro se application, Petitioner challenges his convictions for first-degree premeditated murder,
Mich. Comp. L. § 750.316(1)(a); first-degree felony murder, Mich. Comp. L. § 750.316(1)(b);
second-degree murder, Mich. Comp. L. § 750.317; and first-degree child abuse, Mich. Comp. L.
§ 750.136b(2).  For the reasons set forth below, the Court dismisses with prejudice the habeas
petition.  The Court denies a certificate of appealability, and it grants Petitioner leave to proceed
in forma pauperis on appeal.

**I. BACKGROUND**

Petitioner was convicted following a bench trial in Michigan's Wayne County Circuit
Court.  This Court recites verbatim the relevant facts relied upon by the Michigan Court of
Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1), see
Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009):

Defendant's convictions arise from the October 19, 2010, drowning deaths of his two minor children, 15–month old Ella Grace Stafford, and 13–month–old Jonathan Alan Sanderlin. Ella was born to defendant and Tayler Stafford on July 11, 2009, and Jonathan was born to defendant and Sarah McGee on September 20, 2009. Sometime thereafter, defendant obtained sole custody of Jonathan and both children lived with defendant at his apartment in Allen Park. Tayler would often stay at defendant's apartment with defendant and the two children; Tayler worked and defendant, who was unemployed, cared for the children on a full-time basis. Tayler testified that Ella normally slept through the night and that Jonathan would wake up during the night. Tayler testified that she could normally hear Jonathan when he awoke in the night. Tayler never saw the children climb out of their cribs on their own, play during the night, or turn the bathtub water on by themselves. Tayler testified that defendant never told her that the children could climb out of their cribs on their own.

At trial, several individuals testified concerning defendant's treatment of the children. Tayler testified that defendant called Jonathan a "fat heifer" and that defendant would pick him up by the arm and spank him on the legs and face. She saw defendant pull Jonathan by the arm and smack him in the face. Tayler testified that defendant stated that his conduct amounted to "tough love." Tayler testified that Jonathan cried constantly from the time he awoke until he went to bed. Tayler observed defendant put his hand over the child's mouth while he was crying and on one occasion defendant put pillows over Jonathan's face while he was crying. Tayler testified that when she tried to pick Jonathan up, he "flinched" in anticipation of physical contact. Tayler stated that on one occasion when she tried to confront defendant about his treatment of Jonathan, defendant "screamed" and "yelled" and "came at [her]." Tayler testified that she called Child Protective Services (CPS) out of concern for Jonathan's safety. Tayler also sent an email to Jonathan's mother to inform her that Jonathan was being abused and neglected.

Windy Moritz, Ella's maternal grandmother, testified that she observed defendant care for Jonathan when defendant occasionally brought the child over to her home. Moritz stated that defendant treated Jonathan different than Ella and would "yank him up by the arm" and call him a "big old crybaby." Moritz testified that Jonathan did not like water as much as Ella did and on one occasion she saw defendant splash freezing water from a swimming pool onto Jonathan's face while he was crying. Moritz testified that defendant let Jonathan fall out of a chair at her home onto cement without regard and instead stated that Jonathan "had to learn." Moritz testified that she last saw Jonathan one or two months before his death and at that time he was just starting to crawl; Mortiz never saw Jonathan try to climb into or out of a bathtub.

Several neighbors from defendant's apartment complex testified about defendant's treatment of the children. One neighbor, Lindsey Cook, testified that defendant left the children in his parked vehicle alone for 45 minutes and picked the children up by the wrists and "carr[ied] them around like books." Cook testified that defendant

2

pushed the children into his apartment with his feet and yelled at the children when they cried and told them to "shut up." Cook did not see defendant act or talk kindly to the children. Cook testified that she called CPS three or four times out of concern for the children. Similarly, Jennifer Lewindowski testified that defendant left the children alone in his vehicle and she indicated that she telephoned the police two or three times out of concern for the children. Another neighbor, Jeweley Peters, testified that she saw defendant with the children two or three times per week. Peters testified that defendant pulled and pushed the children by the head every time she saw them. Peters explained that defendant told his children to "get the 'f' in the house or car," and picked the children up like a "backpack" and "flung" them in a "very uncaring" way. Peters testified that defendant swore at the kids and she saw the children left alone in defendant's vehicle while it was on with the radio blaring and the children screaming. Peters telephoned the police on that occasion.

On Monday October 18, 2010, the day before the children's deaths, Tayler and defendant had an argument. Two neighbors testified that they heard defendant arguing with a female in the hallway sometime between 7:00 p.m. and 8:30 p.m. Another neighbor testified that defendant was arguing on a telephone in the hallway at approximately 9:30 p.m. Three other neighbors, including two who lived on the floors directly above defendant's apartment, testified that they heard water start running at sometime between 7:30 and 9:30 p.m. Testimony indicated that the water continued to run throughout the night and into the early morning hours of October 19, 2010. At 10:00 p.m. on October 18, 2010, Lewindowski, who lived across the hall from defendant, testified that she went out to check her mail and saw defendant "pacing" in the hallway near his door. Lewindowski offered to watch the children for defendant, but defendant declined the offer. Several hours later, at approximately 2:00 a.m. on October 19, Lewindowski awoke to use the restroom and she heard an argument in the parking lot. Lewindowski looked out a window and saw defendant arguing with someone who she thought looked like Tayler.

At approximately 2:04 a.m. on October 19, 2010, defendant called 9–1–1; when dispatch answered the call, the call disconnected. Defendant called 9–1–1 again and again the telephone call disconnected when the operator answered the call. Operators at the dispatch center called defendant's cellular telephone three times, but each call went unanswered. An operator finally left a voicemail on defendant's cell phone. Defendant eventually called 9–1–1 again several minutes later and reported that his two children drowned while he slept. A few minutes later, Allen Park Police Officers Kevin Gersky and Adam Begley were dispatched to defendant's lower-level apartment. Upon entry, Gersky and Begley found that the lower-level of the apartment complex was hot and humid and flooded with water. Standing water pooled at the entryway into defendant's apartment; the door was open. Gersky and Begley heard defendant yell for help and they entered his apartment. Inside, the officers found defendant sitting on the floor in the master bedroom with his two children lying face-up on the ground with their feet facing defendant. The children were motionless and defendant stated that he tried to resuscitate the children. Immediately thereafter, emergency medical services

3

(EMS) personnel arrived and the children were pronounced dead at the scene. Defendant told police that he put the children to bed at about 8:30 or 9:00 p.m. and then went to bed at 10:00 p.m. Defendant stated that he awoke at 2:00 a.m. and found that his floor was wet. Defendant stated that he then went into the bathroom and found Ella lying face-down on the floor next to the sink and Jonathan lying face-down in the bathtub. Defendant told Officer Gersky that the children had just recently started to walk and both were able to climb out of their cribs.

After removing defendant from the scene, several investigators searched defendant's apartment and they testified about their findings at trial. Police observed that Ella was wearing a diaper and socks and Jonathan was dressed in jeans and a shirt. Jonathan appeared badly burned and the top layer of skin on his hand was "degloved" or completely peeled off. Police did not notice debris on either child. Defendant's apartment was saturated with water throughout and there was less than one inch of standing water on the bathroom floor. The bathtub had water inside and both of the drains inside the tub were clogged with toilet paper. There were several items inside the bathtub including a plastic garbage can and there were pieces of wet toilet paper strewn throughout the bathroom. One police officer testified that the bathroom appeared as if a fight had taken place inside. In the children's bedroom, the mattresses in one of the cribs was wet and the smoke detectors inside the apartment were detached from the wall with the batteries removed. Defendant's bed was "neat" and "made" except for the east-side of the bed. There were numerous other photographs of the interior of the apartment that were admitted into evidence.

Wayne County Medical Examiner Dr. Carl Schmidt, a forensic pathologist, performed an autopsy on Ella and Jonathan's bodies on October 20, 2010. Schmidt testified that 80–percent of Jonathan's body was burned with full-thickness burns where the superficial layer of skin was lost. Schmidt testified that the scalding patterns indicated that Jonathan had been submerged in hot water for a prolonged period of time and he characterized Jonathan as having been "cooked." Schmidt testified that Jonathan's pubic region was spared because he was wearing a diaper and that part of Jonathan's back and chin were spared. Schmidt theorized that Jonathan was submerged in hot water with his back pressed against the bottom of the bathtub with part of his chin out of water. Schmidt testified that Jonathan was clothed with a shirt and jeans after he was removed from water because there was no sparing pattern to support that Jonathan was clothed while he was submerged in hot water.

Schmidt testified that an internal examination showed significant decomposition that was accelerated by exposure to heat. Schmidt testified that Jonathan drowned before his body was burned because he did not find evidence of any signs of "vital reaction" and because he did not find any inhalation burns. Schmidt found three small foreign objects inside Jonathan's lungs including a fiber filament that could have been from cellulose paper. Schmidt testified that Jonathan inhaled the items in the process of aspirating water when his head was submerged. Schmidt testified

that an adult loses consciousness after 30 seconds under water and death ensues a couple minutes thereafter. Schmidt stated that a child would naturally try and remove his head from underneath water. Schmidt testified that, in his medical opinion, Jonathan was intentionally drowned and he listed the manner of death as a homicide. Schmidt explained that it was highly unlikely a child without any neurological impairment and some ability to ambulate would not have removed himself from water. He stated that foreign bodies inside Jonathan's lungs supported that Jonathan was deliberately drowned in that the child actively and "deeply aspirated" water.

Schmidt testified that Ella's body was not burned to the same degree as Jonathan's. Schmidt did not find evidence that Ella aspirated hot water and he testified that Ella drowned before she was placed face-down in hot water. Ella's body was 25–percent burned and Schmidt testified Ella did not have distinct "immersion lines," indicating that she was likely moved several times while in hot water. Schmidt testified that, although Ella was allegedly found on the bathroom floor, the burn patterns on her body showed that she was in hot water long enough to suffer the burns, and then removed from the water and placed on the floor. Schmidt testified that, based on his findings, Ella could not have drowned in water just two or three inches deep. He stated that a child Ella's age would not accidentally drown in two or three inches of water. Schmidt testified that it is rare for a child over the age of one to drown in a bathtub because that is generally the age when an infant becomes ambulatory. Schmidt concluded that Ella died of an intentional drowning and he classified her death as a homicide. Schmidt testified that part of his conclusion was based on the fact that two children drowned and suffered scalding burns with no apparent reaction and without either child making any noise or being able to escape. Schmidt explained that children under the age of one would be easily restrained so he would not expect to see signs of trauma or struggle.

Defendant offered the expert testimony of Dr. Ljubisa Dragovic, a forensic pathologist and Chief Medical Examiner for Oakland County. Dragovic testified that he reviewed the autopsy reports, photographs, microscopic slides, the Michigan State Police crime scene report, photographs and Schmidt's preliminary examination testimony. Dragovic testified that he agreed that the cause of death was drowning, but stated that, based on what he reviewed, there was no evidence to support the conclusion that the drowning was caused by a purposeful act. Dragovic testified that he did not find any evidence to substantiate Schmidt's conclusion that the children's heads were intentionally held under water. Dragovic testified that evidence in a person's lungs could not establish whether a drowning was intentionally inflicted. Dragovic testified that it was possible that Ella drowned on the bathroom floor and he stated that Jonathan was clothed when he drowned because of the sparing patterns on the child's body. Dragovic agreed that Jonathan was tall enough to climb into the bathtub on his own and may have been unable to climb out of the bathtub. He agreed that Ella may have been unable to exit the bathroom because of a barrier in front of the bathroom door. However, Dragovic testified that he would not classify the deaths as accidental, and nothing from what

5

he examined either proved or disproved homicide. Dragovic testified that he did not know whether it was rare for infants older than 12 months to drown in a bathtub.

The trial court found defendant guilty of second-degree murder for the death of Jonathan and premeditated first-degree murder, felony murder, and first-degree child abuse for the death of Ella. The court reasoned that the interior of the bathroom did not show evidence of child's play, but rather showed evidence of staging, and the court noted that the bathtub drains appeared to be deliberately plugged. The court concluded that defendant's version of events lacked credibility. The court found that it would have been nearly impossible for Jonathan to climb out of his crib given that he had just learned to walk, and it reasoned that Ella was agile, intelligent, and able to walk and climb such that she could have removed herself from danger and would not have drowned on the bathroom floor as defendant claimed she did. The court concluded that defendant held Jonathan's head under water to make him quiet, and then drowned Ella to establish the defense of accident when he realized Jonathan was dead.

People v. Nicholson, No. 304784, 2012 WL 4512570, at *1–*5 (Mich. Ct. App. Oct. 2, 2012); lv. den. 827 N.W.2d 202 (Mich. 2013).

Petitioner filed a petition for a writ of habeas corpus, which was held in abeyance so that he could return to the state courts and exhaust additional claims.  See Nicholson v. Haas, No. 14-CV-10828, 2016 WL 1623993 (E.D. Mich. Apr. 25, 2016); app. dism. No. 18-2028, 2018 WL 6566663 (6th Cir. Oct. 4, 2018).

Petitioner filed a post-conviction motion for relief from judgment, which the trial court denied.  People v. Nicholson,  No. 10-012115-01 (Wayne Cnty. Cir. Ct., Dec. 5, 2016) (Dkt. 24-4).  The Michigan appellate courts denied Petitioner leave to appeal.  People v. Nicholson, No. 338544 (Mich. Ct. App. Aug. 31, 2017) (Dkt. 24-5), lv. den., 914 N.W.2d 918 (Mich. 2018).

The Court subsequently reopened the case and permitted Petitioner to amend his petition. 11/5/20 Order (Dkt. 20).  In his original and amended petitions, Petitioner seeks habeas relief on the following grounds:

I. The trial court violated appellant's due process rights by allowing the prosecutor to introduce unfairly prejudicial evidence of alleged child abuse not tending to show motive, intent, or absence of accident.

6

II. MCL 768.37, which conditions the right to offer evidence of diminished capacity from voluntary consumption of medication on a defendant's status as a legal drug user, violates appellant's due process right to present a defense establishing that, due to Xanax overdose, appellant was unable to formulate the specific intent to kill his children or to knowingly or intentionally cause them serious physical harm.

III. The trial court violated appellant's due process rights by not allowing the evidence of his intoxication on Xanax to be made a part of the record to be evaluated in court. This qualifies as newly discovered evidence since this fact was never offered as evidence from a medical expert on Xanax, like Dr. Gerald Scheiner, as appellant's primary defense.

IV. The judicial misconduct and the prosecutorial mistakes unfairly affected the outcome of appellant's trial which would make a proper determination of guilt possible.

V. Trial counsel's incomplete handling of appellant's case cause his counsel to be ineffective and proved to be a failure to present valuable evidence that would have substantially benefitted defendant's defense (People v. Cabballero, 184 Mich. App. 636, 640, 642; 459 N.W.2d 80 (1990)).

VI. Judge Shannon Nicol Walker incorrectly denied appellant his motion under MCR 6.508(d)(3), when the federal court allowed appellant to go back to the lower trial court for the very same jurisdictional defect reasons to file a motion under MCR 6.500, that Shannon Nicol Walker claims are not present.[1]

Pet. (Dkt. 1); Am. Pet. (Dkt. 21).

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241

et seq., sets forth the standard of review that federal courts must use when considering habeas

petitions brought by prisoners challenging their state-court convictions.  The statute provides in

relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

---

[1] For purposes of clarity, the Court has renumbered Petitioner's first through fourth claims in his amended petition as claims three through six.

7

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412–413 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 409.

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (punctuation modified). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. To obtain habeas relief in federal court, a state prisoner is required to show that the state court's

rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

### III. DISCUSSION

**A.  Habeas Petition**

The Court discusses each of Petitioner's claims for relief in turn.

**1.  Claim 1: Prior Bad Acts Evidence**

Petitioner claims that the trial judge deprived him of a fair trial by allowing the admission of Petitioner's prior acts of child abuse, in violation of M.R.E. 404(b).

It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).  A federal court is limited in federal habeas review to deciding whether a state-court conviction violates the Constitution, laws, or treaties of the United States.  Id.  Errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000).

Petitioner's claim that the state court violated M.R.E. 404(b) by admitting other acts evidence against him does not entitle him to relief because this claim is non-cognizable on federal habeas review. See Estelle, 502 U.S. at 72 (finding that the Supreme Court's habeas powers did not permit the Court to reverse a state-court conviction based on its belief that the state trial judge erred in ruling that prior injury evidence was admissible as bad acts evidence under California law); Dowling v. United States, 493 U.S. 342, 352–353 (1990) (finding that the admission at defendant's bank robbery trial of similar acts evidence that defendant had subsequently been involved in a house burglary for which he had been acquitted did not violate due process).  The admission of this other acts evidence against Petitioner at his state trial does not entitle him to

habeas relief because there is no clearly established Supreme Court law that holds that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of prior bad acts evidence. See Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003). Therefore, Petitioner is not entitled to relief on his first claim.

### 2.  Claims 2 and 3:  Right to Present a Defense

In his second claim, Petitioner contends that his right to present a defense was violated because Mich. Comp. L. § 768.37 does not allow a defendant in Michigan to present a voluntary intoxication defense if the defendant obtained the drugs illegally.  Petitioner claims that he was precluded from presenting evidence from an expert witness that would establish that Petitioner's use of illegally obtained Xanax caused him to be intoxicated to the point that he was unable to form the intent to kill either victim.  In his related third claim, Petitioner submits that his due process rights were violated when, on post-conviction review, the judge refused to consider Petitioner's allegation of newly discovered evidence from his expert witness that intoxication from Xanax negated any specific intent to kill the victims.

As an initial matter, the Michigan Court of Appeals concluded that Petitioner waived this issue because he failed to present any evidence of intoxication or diminished capacity at trial, declining to call a proposed defense expert to offer evidence of Petitioner's mental state at the time of the offense.  Nicholson, 2012 WL 4512570, at *7.

By failing to present any evidence on the issue of intoxication, Petitioner's claim is waived for habeas review.  Waiver is an "intentional relinquishment or abandonment of a known right or privilege."  Johnson v. Zerbst, 304 U.S. 458, 464 (1938).  A criminal defendant who has waived his rights "may not then seek appellate review of claimed deprivation of those rights, for his waiver has extinguished any error."  United States v. Griffin, 84 F.3d 912, 924 (7th Cir. 1996); see also

Shahideh v. McKee, 488 F. App'x 963, 965 (6th Cir. 2012) (stating that "[s]uch a waiver is a recognized, independent and adequate state law ground for refusing to review alleged trial errors"). "When one knowingly waives his charged error, that challenge is forever foreclosed, and cannot be resurrected on appeal." Morgan v. Lafler, 452 F. App'x 637, 646 n.3 (6th Cir. 2011).

The Michigan Court of Appeals concluded that Petitioner waived the issue because defense counsel rested without calling an expert or presenting any evidence on the issue of intoxication. A defendant in a criminal case cannot complain of error that he has invited. Shields v. United States, 273 U.S. 583, 586 (1927). When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error. See Fields v. Bagley, 275 F.3d 478, 486 (6th Cir. 2001).

Petitioner cannot convert a tactical decision not to introduce evidence into a constitutional violation of the right to present evidence. Rodriguez v. Zavaras, 42 F. Supp. 2d 1059, 1150 (D. Colo. 1999); see also State v. Flood, 219 S.W.3d 307, 318 (Tenn. 2007) ("Generally, the right to present a defense is not denied when a defendant does not pursue a line of questioning during cross-examination"). The court did not preclude Petitioner from presenting evidence of his intoxication. Rather, it was defense counsel's decision not to present this evidence. Moreover, even if the issue were not waived, Petitioner would not be entitled to habeas relief. Mich. Comp. L. § 768.37 precludes a defendant from raising an intoxication defense, with one exception. Subsection 2 of the statute states:

> It is an affirmative defense to a specific intent crime, for which the defendant has the burden of proof by a preponderance of the evidence, that he or she voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that he or she would become intoxicated or impaired.

Mich. Comp. L. § 768.37(2).

The Michigan Court of Appeals rejected petitioner's claim as follows:

> Here, defendant cannot show that he has a constitutionally-protected interest in committing a crime—i.e. consuming illegal drugs—and then using commission of that crime as a defense to a greater offense. Nor can defendant show that the statute is arbitrary. Furthermore, irrespective of whether the Xan[a]x defendant allegedly took was illegally-obtained, defendant cannot show that evidence of his intoxication was otherwise admissible. In particular, nothing in defendant's offer of proof shows that he "did not know and reasonably should not have known that he would become intoxicated or impaired . . . " by ingesting the amount of Xanex he admitted to consuming. Thus, the evidence would not have been admissible under MCL 768.37(2). In sum, defendant was not denied his right to present a defense.

Nicholson, 2012 WL 4512570, at *7.

Just as a defendant has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, a defendant also has the right to present his or her own witnesses to establish a defense. This right is a fundamental element of due process of law. Washington v. Texas, 388 U.S. 14, 19 (1967); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[W]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (punctuation modified, internal citations omitted). However, a defendant does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. Montana v. Egelhoff, 518 U.S. 37, 42 (1996). The Supreme Court has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." Crane, 476 U.S. at 689. The Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). Finally, rules that exclude evidence from criminal trials do not violate the right to present

a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

Under the standard of review for habeas cases as provided in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect.  Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent."  Rockwell v. Yukins, 341 F.3d 507, 511–512 (6th Cir. 2003).

"Due process does not require that a defendant be permitted to present any defense he chooses.  Rather, states are allowed to define the elements of, and defenses to, state crimes."  Lakin v. Stine, 80 F. App'x 368, 373 (6th Cir. 2003).  The circumstances under which a criminal defense may be asserted is thus a question of state law.  Id.

Michigan law prohibits a defendant from raising an intoxication defense if he obtained the controlled substances illegally.  Petitioner admits that he did not legally obtain the Xanax.  The Court must defer to the determination by the Michigan courts that a person like Petitioner who becomes intoxicated from drugs that he obtained illegally cannot raise an intoxication defense.  Nothing in the Due Process Clause prevents a state from disallowing consideration of a voluntary intoxication defense.  Egelhoff, 518 U.S. at 56.

Therefore, Petitioner is not entitled to habeas relief on his second claim to the extent he contends that his right to present a defense was violated or his third claim.

13

### 3. Claim 2: Insufficiency of Evidence

As part of his second claim, Petitioner alleges that there was insufficient evidence to sustain his convictions because the prosecutor presented insufficient evidence that Petitioner intended to harm his children.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 318–319 (emphasis in original). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 319 (emphasis in original). The Jackson standard applies to bench trials and to jury trials. See, e.g., United States v. Bronzino, 598 F.3d 276, 278 (6th Cir. 2010).

When addressing a sufficiency of evidence challenge, the reviewing court must give circumstantial evidence the same weight as direct evidence. See United States v. Farley, 2 F.3d 645, 650 (6th Cir. 1993). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006) (punctuation modified); see also Saxton v. Sheets, 547 F.3d 597, 606 (6th Cir. 2008) ("A conviction may be sustained based on nothing more than circumstantial evidence."). Moreover, "[c]ircumstantial evidence is not only sufficient, but may

14

also be more certain, satisfying and persuasive than direct evidence." <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 100 (2003) (punctuation modified); <u>see also</u> <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954) (stating that circumstantial evidence is "intrinsically no different from testimonial evidence" and that "[i]f the jury is convinced beyond a reasonable doubt, we can require no more.").

More importantly, a federal habeas court may not overturn a state-court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state-court decision was an objectively unreasonable application of the <u>Jackson</u> standard. <u>See</u> <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u> For a federal habeas court reviewing a state-court conviction, "the only question under <u>Jackson</u> is whether [the jury] finding was so insupportable as to fall below the threshold of bare rationality." <u>Coleman v. Johnson</u>, 566 U.S. 650, 656 (2012). A state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under [the] AEDPA." <u>Id.</u>

On habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. <u>Neal v. Morris</u>, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court, therefore, must defer to the factfinder for its assessment of the credibility of witnesses. <u>Matthews v. Abramajtys</u>, 319 F.3d 780, 788 (6th Cir. 2003); <u>see also</u> <u>United States v. Vance</u>, 956 F.3d 846, 853 (6th Cir. 2020) (explaining that, in a bench trial, the credibility of

15

witnesses is a question for the trial judge).   The reviewing court need not be convinced of a petitioner's guilt beyond a reasonable doubt.   Walker v. Russell, 57 F.3d 472, 475 (6th Cir. 1995).

To convict a defendant of first-degree murder in Michigan, the state must prove that a defendant's intentional killing of another was deliberated and premeditated. See Scott v. Elo, 302 F.3d 598, 602 (6th Cir. 2002) (citing People v. Schollaert, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992)).   The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. See Johnson v. Hofbauer, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001) (citing People v. Anderson, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995)).   Premeditation may be established through (i) the prior relationship of the parties, (ii) the defendant's actions before the killing, (iii) the circumstances of the killing itself, and (iv) the defendant's conduct after the killing. Cyars v. Hofbauer, 383 F.3d 485, 491 (6th Cir. 2004); Anderson, 531 N.W.2d at 786.

Although the minimum time required under Michigan law to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" Williams v. Jones, 231 F. Supp. 2d 586, 594–595 (E.D. Mich. 2002) (punctuation modified).   "[A]n opportunity for a 'second look' may occur in a matter of seconds, minutes, or hours, depending upon the totality of the circumstances surrounding the killing." Id. (punctuation modified).   "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the issue of premeditation." Alder v. Burt, 240 F. Supp. 2d 651, 663 (E.D. Mich. 2003).   Further, premeditation and deliberation may be inferred from the type of weapon used and the location of the wounds inflicted.   People v. Berry, 497 N.W.2d 202, 204 (Mich. Ct. App. 1993).   Use of a lethal weapon will support an inference of an intent to kill.   Johnson, 159 F. Supp. 2d at 596.

16

Premeditation and intent to kill may be inferred from circumstantial evidence. DeLisle v. Rivers, 161 F.3d 370, 389 (6th Cir. 1998).

Under Michigan law, the elements of first-degree felony murder are: (i) the killing of a human being, (ii) with an intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result, (iii) while committing, attempting to commit, or assisting in the commission of any of a set of specifically enumerated felonies. Matthews v. Abramajtys, 319 F.3d 780, 789 (6th Cir. 2003). The Michigan Supreme Court has indicated that "[a] jury can properly infer malice from evidence that a defendant set in motion a force likely to cause death or great bodily harm." People v. Aaron, 299 N.W.2d 304, 327 (Mich. 1980).

First-degree child abuse is a predicate felony under Michigan's felony murder statute. Galvan v. Stewart, 705 F. App'x 392, 398 (6th Cir. 2017) (citing Mich. Comp. L. § 750.3161(1)(b)). "A person is guilty of child abuse in the first-degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." Mich. Comp. L. § 750.136b(2). "Serious physical harm" is defined as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." Mich. Comp. L. § 750.136b(1)(f). First-degree child abuse is a specific intent crime. Galvan, 705 F. App'x at 398.

Under Michigan law, the elements of second-degree murder are: (i) a death, (ii) caused by an act of the defendant, (iii) with malice, and (iv) without justification or excuse. Stewart v. Wolfenbarger, 595 F.3d 647, 654 (6th Cir. 2010). "[M]alice is defined as the intent to kill, the

intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm."  Id.

The Michigan Court of Appeals rejected Petitioner's claim, finding that there was sufficient evidence to sustain his convictions.  Nicholson, 2012 WL 4512570, at *8.  The Michigan Court of Appeals' rejection of Petitioner's sufficiency of evidence claim was reasonable and precludes relief.  There was a wealth of evidence concerning Petitioner's prior extensive history of abusing both children, which would negate Petitioner's claim that this was an accidental drowning.  The evidence was sufficient to establish that Petitioner was the person who drowned and burned both victims and that the acts were intentional.

Moreover, the Michigan Court of Appeals rejected Petitioner's related other-acts evidence claim and concluded that there was significant evidence to support the judge's finding that Petitioner intentionally killed both victims:

> In addition, defendant cannot show that it is more probable than not that admission of the other-acts evidence undermined the reliability of the verdict. Here, the trial court made findings of fact on the record and the court's findings indicated that the other-acts evidence did not impact its verdict. Moreover, there was substantial other evidence that supported the trial court's verdict. Schmidt testified that the children were deliberately drowned and stated that it was rare for children over the age of 12 months to drown in a bathtub. Schmidt testified that Jonathan was clothed after he drowned, and evidence that Jonathan's crib was wet supported Schmidt's theory. Further, evidence showed that Jonathan had just started walking, and Tayler testified that she never saw Jonathan or Ella climb out of their cribs. This would have allowed a trier of fact to conclude that the children did not climb out of their cribs and drown in the bathtub on their own accord. Additionally, Schmidt testified that Ella had scalding patterns on her body that had to have occurred in the bathtub, which undermined the defense theory that Ella drowned on the bathroom floor. And, evidence showed that Ella was coordinated and able to walk, which also undermined the defense theory that she could not remove herself from water on the bathroom floor. In addition, evidence would have allowed the trier of fact to conclude that the bathroom was staged. Other evidence showed that defendant did not immediately answer or return the 9–1–1 dispatcher's telephone calls, and instead waited several minutes to contact 9–1–1 after he discovered his children. Evidence also would have allowed a trier of fact to infer that defendant deliberately removed and disconnected the smoke detectors in the apartment so they would not

18

activate from the steam in the bathroom. Other circumstantial evidence supported the trial court's verdict including evidence that defendant's bed was neat and made and did not appear slept on, and testimony showed that neighbors saw defendant pacing outside his apartment at 10:00 p.m.—the same time defendant told police he had gone to bed—and saw him arguing in the parking lot at approximately 2:00 a.m. In sum, defendant cannot show that there is a reasonable probability that the other-acts evidence undermined the reliability of the verdict.

Nicholson, 2012 WL 4512570, at *7.

This Court agrees with the Michigan Court of Appeals that there was sufficient evidence from which a rational trier of fact could conclude that Petitioner intentionally killed his children. Although Petitioner notes that his own defense expert, Dr. Dragovic, concluded that there was no evidence that the victims had been intentionally drowned, a federal court reviewing a state-court conviction on habeas review that is "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Cavazos, 565 at 7 (punctuation modified). Moreover, when evidence in a bench trial "consists largely of contradictory oral evidence, due regard must be accorded the trial court's opportunity to judge the credibility of witnesses." Bryan v. Gov't of Virgin Islands, 150 F. Supp. 2d 821, 827 (D. Virgin Islands 2001). In this case, the trial court judge chose to credit Dr. Schmidt's testimony. This Court must defer to the trial court's credibility findings. Id. at 828; Vance, 956 F.3d at 853. Petitioner is not entitled to relief on his sufficiency of evidence claim.

### 4. Claims 4 and 5: Procedurally Defaulted Claims

Respondent argues that Petitioner's fourth and fifth claims are procedurally defaulted because he raised them for the first time on post-conviction review and failed to establish cause and prejudice, as required by Michigan Court Rule 6.508(D)(3), for failing to raise these claims on his direct appeal.

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless Petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750–751 (1991). If a habeas petitioner fails to show cause for the procedural default, it is unnecessary for the court to reach the prejudice issue. Smith v. Murray, 477 U.S. 527, 533 (1986). However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. Murray v. Carrier, 477 U.S. 478, 497 (1986). To be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. Schlup v. Delo, 513 U.S. 298, 324 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998).

Michigan Court Rule 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. For purposes of a conviction following a trial, "actual prejudice" means that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." M.C.R. 6.508(D)(3)(b)(i).

Petitioner did attempt to raise these claims in a pro se Standard 4 appeal brief that he filed in the Michigan Court of Appeals on his appeal of right, in addition to the brief filed by the State

Appellate Defender Office.[2]  The Michigan Court of Appeals declined to review the claims that Petitioner had raised in his Standard 4 brief because Petitioner did not present any legal arguments in support of his claims, nor did he offer any legal authority in support of his claims.  Nicholson, 2012 WL 4512570, at *8.  In Michigan, a party who seeks to raise an issue on appeal but fails to brief it is considered to have abandoned the issue on appeal.  People v. Smith, 480 N.W.2d 908 (Mich. 1992); Mitcham v. City of Detroit, 94 N.W.2d 388 (Mich. 1959).  Petitioner's fourth and fifth claims were abandoned on direct review.  In fact, this Court held the case in abeyance to permit Petitioner to return to the state courts to present these claims on post-conviction review.  It did so after concluding that the claims were unexhausted because Petitioner abandoned the claims by failing to properly brief them on direct review.  Nicholson, 2016 WL 1623993, at *2.  Post-conviction review was the first time that Petitioner raised these claims before the Michigan courts.  Under Michigan Court Rule 6.508(D)(3), he was required to show good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom.

The Supreme Court has stated that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989) (punctuation modified).  If the last state-court judgment contains no reasoning but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state-court judgment rejecting the federal claim and apply a presumption that

---

[2] Standard 4 of Administrative Order 2004-6, 471 Mich. cii (2004), "explicitly provides that a pro se brief may be filed within 84 days of the filing of the brief by the appellant's counsel, and may be filed with accompanying motions."  Ware v. Harry, 636 F. Supp. 2d 574, 594 n.6 (E.D. Mich. 2008).

later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The Michigan Supreme Court rejected Petitioner's post-conviction appeal on the ground that "the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  Nicholson, 914 N.W.2d at 918–919.  The Michigan Court of Appeals denied Petitioner's post-conviction appeal in a form order "because the defendant failed to establish that the trial court erred in denying the motion for relief from judgment."  Nicholson, No. 338544 at PageID.1798.  These orders, however, did not refer to subsection (D)(3) of Michigan Court Rule 6.508, nor did they mention Petitioner's failure to raise his claim on his direct appeal as their rationale for rejecting his post-conviction claims.  Because the form orders in this case citing Rule 6.508(D) are ambiguous as to whether they refer to procedural default or a denial of post-conviction relief on the merits, the orders are unexplained.  See Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010).  This Court must "therefore look to the last reasoned state court opinion to determine the basis for the state court's rejection" of Petitioner's claims.  Id.

The Wayne County Circuit Court judge rejected Petitioner's post-conviction claims because Petitioner failed to show that any of his claims were jurisdictional defects that would survive Michigan Court Rule 6.508(D)(3)'s cause and prejudice standard.  Nicholson, No. 10-012115-01, at *6.  Because the trial court judge denied Petitioner post-conviction relief based on the procedural grounds stated in Michigan Court Rule 6.508(D)(3), Petitioner's fourth and fifth claims are procedurally defaulted pursuant to Michigan Court Rule 6.508(D)(3). See Ivory v. Jackson, 509 F.3d 284, 292–293 (6th Cir. 2007); Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005).

In his sixth claim, Petitioner argues that the trial judge erred in denying him post-conviction relief pursuant to Michigan Court Rule 6.508(D)(3) because this provision does not apply to jurisdictional defects.

Petitioner is correct that the "good cause" and "actual prejudice" prerequisites of Michigan Court Rule 6.508(D)(3) need not be satisfied where a defendant properly alleges a jurisdictional defect in a prior proceeding that resulted in a conviction and sentence.  See People v. Carpentier, 521 N.W.2d 195, 199 (Mich. 1994).  Neither Petitioner nor Respondent, however, has cited to any cases that either support or defeat the notion that judicial bias, prosecutorial misconduct, or ineffective assistance of counsel is a jurisdictional defect within the meaning of Michigan Court Rule 6.508(D)(3).  The general rule in Michigan is that "[w]ith the exception of the failure to appoint counsel, constitutional violations, including the denial of effective assistance of counsel, do not constitute a jurisdictional defect under M.C.R. 6.508(D)."  Etherton v. Rivard, 800 F.3d 737, 747 (6th Cir. 2015), rev'd on other grounds sub nom. Woods v. Etherton, 578 U.S. 113 (2016) (punctuation modified).  The Sixth Circuit has suggested that a judicial bias claim could be subject to the cause and prejudice requirements of Michigan Court Rule 6.508(D)(3).  See Gordon v. Lafler, 710 F. App'x 654, 657–658 (6th Cir. 2017).  But it has declined to procedurally default a petitioner on his claim because the state trial court opinion, which was the last reasoned decision from the state courts, did not rely on the procedural bar contained in 6.508(D)(3) to reject the judicial bias claim but instead rejected the claim on the merits.  Id.  The Court concludes that Petitioner's claims do not involve a jurisdictional defect that would be exempt from the cause and prejudice requirements of Michigan Court Rule 6.508(D)(3).  Therefore, Petitioner's claims are defaulted.

Petitioner has offered no reasons for his failure to raise his fourth and fifth claims on his appeal of right.  Petitioner did not raise a claim of ineffective assistance of counsel or provide any other reason to excuse the various procedural defaults.  By failing to raise any claim or issue to excuse the procedural defaults, Petitioner "has forfeited the question of cause and prejudice." Rogers v. Skipper, 821 F. App'x 500, 503 (6th Cir. 2020).

In addition, Petitioner has not presented any new reliable evidence to support any assertion of innocence that would allow this Court to consider his defaulted claims as a ground for a writ of habeas corpus despite the procedural defaults.  Petitioner's sufficiency of evidence claim is insufficient to invoke the actual innocence exception to the procedural default rule.  See Malcum v. Burt, 276 F. Supp. 2d 664, 677 (E.D. Mich. 2003).  Therefore, Petitioner is not entitled to relief on his fourth and fifth claims.

### 5.  Claim 6: Post-Conviction Infirmity Claim

In his sixth claim, Petitioner argues that the trial judge erred by invoking Michigan Court Rule 6.508(D)(3) to deny his post-conviction motion for relief from judgment.

Petitioner is not entitled to habeas relief on his sixth claim because it involves an alleged deficiency with his state post-conviction proceedings.  "[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007).  Because states have no constitutional obligation to provide post-conviction remedies, a federal habeas corpus petition cannot be used to mount a challenge to a state's scheme of post-conviction relief.  Greer v. Mitchell, 264 F.3d 663, 681 (6th Cir. 2001).  Further, challenges to state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254" because "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the

24

traditional function of the writ is to secure release from illegal custody." Kirby v. Dutton, 794 F.2d 245, 246 (6th Cir. 1986) (punctuation modified). "A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not result [in] . . . release or a reduction in . . . time to be served or in any other way affect [the petitioner's] detention because [the court] would not be reviewing any matter directly pertaining to [the petitioner's] detention." Cress, 484 F.3d at 853 (punctuation modified). Thus, the "scope of the writ" does not encompass a "second tier of complaints about deficiencies in state post-conviction proceedings." Kirby, 794 F. 2d at 248. Therefore, Petitioner is not entitled to relief on his sixth claim.

### B.  Certificate of Appealability

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). The district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484–485 (2000). When a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability should issue if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Id. at 484. "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to

proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).  In applying that standard, a district court may not conduct a full merits review but instead must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims.  <u>Id.</u> at 336–337.

In this case, Petitioner fails to make a substantial showing of the denial of a constitutional right as to his habeas claims, and jurists of reasons could not debate the correctness of the Court's procedural rulings.  Therefore, the Court denies a certificate of appealability.

### C.  Leave to Proceed <u>In Forma Pauperis</u> on Appeal

While a certificate of appealability may be granted only if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant an application for leave to proceed <u>in forma pauperis</u> on appeal if it finds that an appeal can be taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(2).  "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits.  <u>Foster v. Ludwick</u>, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).  Although jurists of reason would not debate this Court's resolution of petitioner's claims, the issues are not frivolous.  Therefore, an appeal could be taken in good faith, and Petitioner may proceed <u>in forma pauperis</u> on appeal.  <u>Id</u>.

### IV.  CONCLUSION

For the reasons set forth above, the Court denies and dismisses with prejudice the petition for a writ of habeas corpus, declines to issue a certificate of appealability, and grants Petitioner leave to proceed <u>in forma pauperis</u> on appeal.

SO ORDERED.

Dated: June 3, 2022                                 s/Mark A. Goldsmith
Detroit, Michigan                                  MARK A. GOLDSMITH
                                                   United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 3, 2022.

s/Karri Sandusky
KARRI SANDUSKY
Case Manager

27